## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) JA'LEE FOREMAN, JR.,<br>(2) DANIEL HEDRICK,<br>(3) JOSEPH MITCHELL, and<br>(4) JOHN BASCO,<br><br>       Plaintiffs,<br><br>vs.<br><br>(1) OKLAHOMA COUNTY SHERIFF,<br>(2) OKLAHOMA COUNTY CRIMINAL<br>    JUSTICE AUTHORITY,<br>(3) BOARD OF COUNTY COMMISSIONERS<br>    FOR OKLAHOMA COUNTY,<br>(4) CHRISTIAN CHARLES MILES,<br>(5) GREGORY CORNELL BUTLER, JR.,<br><br>       Defendants. | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) | CASE NO.:  CIV-21-1062-F<br><br>Attorney Lien Claimed<br><br>Jury Trial Demanded |

### COMPLAINT

**COME NOW**, the Plaintiffs, Ja'Lee Foreman, Jr., Daniel Hedrick, Joseph "Joey" Mitchell and John Basco and for their Complaint against the above-named Defendants, state and allege as follows:

### PARTIES

1.     Plaintiff Ja'Lee Foreman, Jr. ("Mr. Foreman" or "Foreman") is an individual and a citizen of the State of Oklahoma.

2.     Plaintiff Daniel Hedrick ("Mr. Hedrick" or "Hedrick") is an individual and a citizen of the State of Oklahoma.

3.     Plaintiff Joseph "Joey" Mitchell ("Mr. Mitchell" or "Mitchell") is an individual and a citizen of the State of Oklahoma.

4.     Plaintiff John Basco ("Mr. Basco" or "Basco") is an individual and a citizen of the State of Oklahoma.

5.      Defendant Oklahoma County Sheriff (currently Tommie Johnson, III) is sued in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014).   Thus, in suing the Oklahoma County Sheriff in his official capacity, Plaintiffs have brought suit against the County/Oklahoma County Sheriff's Office ("OCSO"). The Oklahoma County Sheriff is being sued in his official capacity because, during the times when Plaintiffs' Constitutional rights were violated at the Oklahoma County Detention Center ("Oklahoma County Jail" or "Jail"), OCSO maintained responsibility for the management and operation of the Jail. This included primary responsibility for the creation and implementation of official policies, customs and practices in place at the Jail.

6.      Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust") is a public trust created for the furtherance of purported public functions pursuant to 60 Okla. Stat. § 176, *et seq.* OCCJA was created by a certain "Trust Indenture."   Under the Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of operating the Oklahoma County "Jail Facilities", which includes the Oklahoma County Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA was delegated the responsibility of developing policies and procedures to address the administration of the Jail. However, the Trust Indenture specifically provides that the Oklahoma County Sheriff was to continue operating the Jail until such time as the OCCJA and Oklahoma County had entered into a lease agreement and/or funding agreement(s) that specifically provided for the OCCJA to commence responsibility for management and operation of the Jail. OCCJA did not take over responsibility for management and operation of the Jail until June 1, 2020. However, since June 1,

2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff and a member of the Oklahoma County Board of County Commissioners are permanent members / trustees of the OCCJA.  OCCJA is sued as a successor County entity under Plaintiffs' municipal liability theory.

7.      Defendant Board of County Commissioners for Oklahoma County ("Board" or "BOCC") is the legislative entity with non-delegable statutory responsible for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates. *See* 57 O.S. § 41.

8.      Defendant Christopher Charles Miles ("Officer Miles") or ("Miles") is a citizen of Oklahoma. Officer Miles was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as employee and/or agent of the OCSO and/or OCCJA.

9.      Defendant Gregory Cornell Butler, Jr. ("Officer Butler") or ("Butler") is a citizen of Oklahoma. Officer Miles was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as employee and/or agent of the OCSO and/or OCCJA.

## JURISDICTION AND VENUE

10.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth, Fourteenth and/or Eighth Amendment(s) to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

11.      This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth, Fourteenth and/or Eighth Amendment(s) to the United States Constitution and 42 U.S.C. § 1983.

12.     The acts complained of herein occurred in Oklahoma County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

■   **Individual Plaintiffs**

**Ja'Lee Foreman**

13.     Paragraphs 1-12 are incorporated herein.

14.     In November 2019, Mr. Foreman was an inmate at the Oklahoma County Jail. At that time, Mr. Foreman was just 18-years-old and small in stature.

15.     At all pertinent times, Mr. Foreman was a pretrial detainee.

16.     On November 2, 2019, without provocation, Officer Miles accosted Mr. Foreman at his cell door on the eighth floor of the Jail. Officer Miles' confrontation of  Mr. Foreman was completely unjustified and served no legitimate governmental purpose. Officer Miles' conduct was plainly calculated to agitate, embarrass and provoke Mr. Foreman.

17.      Specifically, Officer Miles yelled at Mr. Foreman, the following in rapid succession: "You f*** up and I'm going to make sure you live in hell!", "I'm going to f*** your Mama" and "I'm going to beat you're a**".

18.      Fearful for his safety, Mr. Foreman remained calm in hopes that this verbal assault would not escalate any further.

19.     Unfortunately, Foreman's attempt to quell the situation was unsuccessful.

20.     Officer Miles next entered Mr. Foreman's cell. Officer Butler was present during this entire episode, and shut the cell door, leaving Mr. Foreman in an enclosed space with Officer Miles.

21.     Officer Miles continued insulting and provoking Mr. Foreman with no reaction. Officer Miles then physically turned Mr. Foreman around and handcuffed him. Thereafter, Officer Butler entered the cell and together Miles and Butler extracted Mr. Foreman from his cell.

22.     Officers Miles and Butler walked Mr. Foreman from his cell and outside the pod. As Mr. Foreman was escorted from the pod, he saw Lieutenant Christopher Raymond Hendershott ("Lieutenant Hendershott"), who made no attempt to intervene or help young Ja'Lee.

23.     Officers Miles and Butler placed Mr. Foreman on a bench outside the pod and then handcuffed him to a bar behind his back.  Ja'Lee was left in this position for over and hour and half.  This prolonged restraint of Mr. Foreman was excessive and not rationally related to any legitimate governmental or penological purpose. Mr. Foreman posed no threat to the Officers or anyone else. He was compliant. He posed no security problem. He was not actively resisting any lawful command.

24.     After responding to a disturbance in another area of the Jail, Officers Miles and Butler returned to the bench where Mr. Foreman was restrained and physically moved him back to his cell. After removing the handcuffs, Officer Miles, in the presence of Officer Butler, drove his knee into Mr. Foreman's back as he slammed him into the wall of his cell. As Mr. Foreman turned around, Officer Miles then spit into Mr. Foreman's face. Both Officer Miles and Officer Butler laughed at Mr. Foreman as they left the cell pod.  This was unnecessary and excessive use of force under any standard.

25.     As a direct and proximate result of Officers Miles and Butler's conduct, Mr. Foreman suffered physical injuries, mental and physical pain and suffering and other damages and losses as described herein.

**<u>Daniel Hedrick</u>**

26.     Paragraphs 1-25 are incorporated herein.

27.     Mr. Hedrick was also an inmate at the Jail in November 2019.

28.     At all pertinent times, Mr. Hedrick was a pretrial detainee.

29.     On November 23, 2019, Officer Miles and Butler tortured and tormented Mr. Hedrick.

30.     More specifically, at approximately 3:15 a.m., Officers Butler and Miles took Hedrick from his cell and placed him into an attorney visitation room on the Eighth floor of the Jail. Officer Miles had previously removed all furniture from the attorney visitation room, which forced Mr. Hedrick to stand.

31.     Officers Butler and Miles then handcuffed Hedrick behind his back and then secured him to the wall where he was left standing for one and ½ hours. In other words, Mr. Hedrick was placed in a "standing stress position," a well-known "enhanced interrogation" or torture tactic.

32.     After securing him to the wall, the Officers played a well-known children's song, "Baby Shark," at high volume on the computer adjacent to the room. "Baby Shark" was played on a continuous loop and Hedrick was forced to listen to the song over and over while physically restrained in the attorney visitation room.

33.     The shift commander, Lieutenant Hendershott, was aware Hedrick had been detained and forced to listen to "Baby Shark" on a loop, but took no action to intervene and stop the misconduct.

34.     This prolonged restraint of Mr. Hedrick, under the conditions described herein, is tantamount to torture, was excessive and not rationally related to any legitimate governmental or penological purpose. Mr. Hedrick posed no threat to the Officers or anyone else. He was compliant. He posed no security problem. He was not actively resisting any lawful command.

35.     Miles, Butler and Hendershott were subsequently charged criminally, in connection with their treatment of Mr. Hedrick, with counts of "Cruelty to Prisoners," "Corporal Punishment to an Inmate" and "Conspiracy." *See State of Oklahoma vs. Hendershott, Miles and Butler,* CM-2020-3083 (Oklahoma County Dist. Court).

36.     As a direct and proximate result of Officers Miles and Butler's conduct as described herein, Mr. Hedrick suffered mental and physical pain and suffering and other damages and losses as described herein.

**Joey Mitchell**

37.     Paragraphs 1-36 are incorporated herein.

38.     Mr. Mitchell was also an inmate at the County Jail in November 2019.

39.     At all pertinent times, Mr. Mitchell was a pretrial detainee.

40.     On November 30, 2019, at approximately 11:45 p.m., Officers Butler  and  Miles took  Mr. Mitchell from  his  cell and placed him into the above-referenced attorney visitation room on the eighth floor of the Jail.  Similar to the Hedrick incident, the Officers removed all furniture from the attorney visitation room, thereby forcing Mr. Mitchell to stand.

41.     As they had done with Mr. Hedrick days earlier, Officers Butler and Miles then handcuffed Mitchell behind his back and then secured him to the wall where he was left standing for a prolonged period of time.  Mr. Mitchell was restrained in the above-referenced "standing stress position" for three (3) to four (4) hours.

42.     After restraining Mitchell to the wall in the "standing stress position", Officers Miles and Butler repeated their inhumane practice of playing the "Baby Shark" song at high volume. Consistent with their practice, "Baby Shark" was played on a  continuous loop and Mitchell was forced to listen to the song over and over while physically restrained in the attorney visitation room. The volume of the song was so loud that it was reverberating down the hallways.

7

43.    Officers Miles and Butler also threatened Mr. Mitchell that he would not be returned to his pod/cell but be placed in "lockdown" a/k/a "the hole."

44.    This prolonged restraint of Mr. Mitchell, under the conditions described herein, is tantamount to torture, was excessive and not rationally related to any legitimate governmental or penological purpose. Mr. Mitchell posed no threat to the Officers or anyone else. He was compliant. He posed no security problem. He was not actively resisting any lawful command.

45.    Miles, Butler and Hendershott were subsequently charged criminally, in connection with their treatment of Mr. Mitchell, with counts of "Cruelty to Prisoners," "Corporal Punishment to an Inmate" and "Conspiracy." *See State of Oklahoma vs. Hendershott, Miles and Butler,* CM-2020-3083 (Oklahoma County Dist. Court).

46.    As a direct and proximate result of Officers Miles and Butler's conduct as described herein, Mr. Mitchell suffered mental and physical pain and suffering and other damages and losses as described herein.

**John Basco**

47.    Paragraphs 1-46 are incorporated herein.

48.    Mr. Basco was an inmate at the County Jail in December 2019.

49.    At all pertinent times, Mr. Basco was a pretrial detainee.

50.    On December 7, 2019, at approximately 2:00 a.m., Officer Miles  took  Basco from his  cell and placed him into the above-referenced attorney visitation room on the eighth floor of the Jail.  Similar to the Hedrick and Mitchell incidents before, Officer Miles removed the furniture from the attorney visitation room, thereby forcing Mr. Basco to stand.

51.    As he had done with Mrs. Hedrick and Michell days earlier, Officer Miles then handcuffed Basco behind his back and then secured him to the wall where he was left standing for

a prolonged period of time.  Mr. Basco was restrained in the above-referenced "standing stress position" for approximately two (2) hours.

52.      After restraining Mr. Basco to the wall in the "standing stress position", Officer Miles repeated the inhumane practice of playing the "Baby Shark" song at high volume. Consistent with this practice, "Baby Shark" was played on a  continuous loop and Basco was forced to listen to the song over and over while physically restrained in the attorney visitation room. The volume of the song was so loud that it was reverberating down the hallways.

53.       This prolonged restraint of Mr. Basco, under the conditions described herein, is tantamount to torture, was excessive and not rationally related to any legitimate governmental or penological purpose. Mr. Basco posed no threat to the Officers or anyone else. He was compliant. He posed no security problem. He was not actively resisting any lawful command.

54.      Miles and Hendershott were subsequently charged criminally, in connection with their treatment of Mr. Mitchell, with counts of "Cruelty to Prisoners," "Corporal Punishment to an Inmate" and "Conspiracy." *See State of Oklahoma vs. Hendershott, Miles and Butler,* CM-2020-3083 (Oklahoma County Dist. Court).

55.      As a direct and proximate result of Officers Miles' conduct as described herein, Mr. Basco suffered mental and physical pain and suffering and other damages and losses as described herein.

- **The Cruelty of Officers Miles and Butler's Practices and the County's Knowledge Thereof**

56.      Paragraphs 1-55 are incorporated herein.

57.     Use of the "Baby Shark" children's song, in the manner described herein, is known device to torment.[1] It has been reported that the City of West Palm Beach has utilized "Baby Shark" outside an event center to deter homeless people from sleeping or convening in the area at night.[2]

58.     More generally, it is well-documented that at Abu Ghraib and Guantanamo Bay, American interrogators blasted heavy metal music as an "enhanced interrogation" technique to weaken Iraqi captives' resolve.

59.     Indeed, the specific "Baby Shark" torture events at the Jail, as summarized above, are now the subject of scientific analysis.  In October of 2020, this specific academic question was posed: *"So what makes "Baby Shark" so agonizing, it's like torture?"*  The scientific answer provided:

> There are actually a lot of reasons for this, clinical psychologist John Mayer, PhD…. "The music can be hard on the ears," he says. "Certain pitches hit the auditory receptors in ways that are physiologically painful. These are high-pitched tones and screechy elongated sounds, like nails across a blackboard." Mayer says these can "elicit a painful reaction in the brain."

> The lyrics also come into play. "When you combine nonsensical words, insulting words, and demeaning words with bad music, you have the perfect storm for a horrible song," Mayer says.

> Overfamiliarity can make a song annoying, too, Beaman adds. "Baby Shark" is "simple enough to be catchy, and has had massive airplay," he says. If you tend to have a strong musical memory for things you find slightly annoying at first, the additional features of "Baby Shark" can make it especially difficult to take on repeat.[3]

---

[1] "…in addition to the episodes in Oklahoma, the tune has found more sinister uses." *See* Bryan Pietsch, *Jail Employees Face Charges After Using 'Baby Shark' Song to Punish Inmates,* **THE NEW YORK TIMES**, (October 6, 2020).

[2] *See* Nicholas Bogel-Burroughs, *A Playlist to Deter the Homeless: 'Baby Shark' and 'Raining Tacos',* **THE NEW YORK TIMES**, (July 18, 2019).

[3] *See* Korin Miller, *'Baby Shark' Was Used to Torture Inmates – And There's a Scientific Reason Why Some Songs Are So Agonizing (Catchy tunes can actually elicit a pain response from the brain)*, **HEALTH,** (October 8, 2020).

60.    The utilization of music to harm and torment has been the topic of academic symposiums with presentations such as *"Music as Torture in Auschwitz and Guantanomo"* offered by Melissa Kagen, a German Studies professor from Stanford University, and its use in "breaking" prisoners' wills.  Professor Kagen explained that what mattered most was the function of the music as unending noise. Amanda Daly, a professor of Ethnomusicology at Boston University entitled her presentation as *"Words and War(riors): Music and the War on Terror"* to explain that music is frequently employed by American soldiers in wars in Iraq and Afghanistan and the torture technique is the loud use of "children's music" while a prisoner is alone in a room and being placed in a "forced standing" position.[4]

61.    The horrific events at the Jail, as described above, have resulted in at least one international article written about its specific cruelty and likening it to the torture of prisoners of war:

> Oklahoma County district attorney David Prater described the Baby Shark punishment as "cruel and inhumane," adding that it put "undue emotional stress on the inmates who were most likely already suffering."

> Prater said that Miles and Butler possess a long history of mistreatment and were the subjects of numerous inmate complaints throughout their career.

> While the use of a children's song for punishment might seem like a comical act, sonic torture has a dark history of being wielded by prison authorities to corner people into submission.

> A 2008 report by *The Guardian* states that inmates in Guantanamo Bay were forced to listen to Metallica's *Enter Sandman* on loop while Deicide's *F**k Your God* has been used by the American military to psychologically torture prisoners in Iraq.[5]

---

[4] *See* Music and Crisis, An Interdisciplinary Graduate Conference, Music and Torture Panel, **UNIVERSITY OF CALIFORNIA, SANTA BARBARA,** (April 14-15, 2012).
[5] *See* Tan Mei Zi, *US prison guards in hot water after forcing inmates to listen to "Baby Shark' on loop while handcuffed,* **MALAY MAIL,** (October 7, 2020).

62.     When Oklahoma County District Attorney David Prater described the Baby Shark punishment as "cruel and inhumane," and that it put "undue emotional stress on the inmates who were most likely already suffering" he was echoing the comment made by Investigator Phillip Hall in the Probable Cause Affidavits, as follows:

Statements made by inmates and staff also indicated that in addition to the corporal punishment given by Miles and Butler, they additionally worked together and played children's music on a loop to play repetitively aloud while the inmates were housed in the attorney visitation booth thus putting undue emotional stress on the inmates who were most likely already suffering from physical stressors.

63.     Moreover, when District Attorney David Prater has publicly commented "that Miles and Butler possess a long history of mistreatment" of inmates.

64.     This history of mistreatment was well known to supervisors at the Jail, but no action was taken to stop the conduct and no reasonable measures were taken to alleviate the risk of harm to detainees like Plaintiffs.

■ **Longstanding Policies and Customs**

65.     Paragraphs 1-64 are incorporated herein.

66.     There is an affirmative link between the aforementioned unconstitutional acts of Officers Miles and Butler and Lieutenant Hendershott and policies, practices and/or customs which Oklahoma County/OCSO/OCCJA promulgated, created, implemented and/or possessed responsibility for.

67.     Oklahoma County/OCSO/OCCJA failed to adequately train and supervise its officers, including Officers Miles and Butler and Lieutenant Hendershott, with respect to, *inter alia*: use of force, de-escalation, the use of force continuum, appropriate use of force in a correctional setting, use of force on a detainee in handcuffs, cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement.

68.     In finding Constitutional liability at the county level, the Tenth Circuit, in *Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008), pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management." Here, the Sheriff's "management style" was "hands-off" at best, and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable.   There was an utter absence of supervision and accountability at the Jail, and an acquiescence and acceptance of lawless behavior, amounting to reckless indifference to the safety and well-being of the inmates like these Plaintiffs.

69.     As summarized in the Probable Cause Affidavits issues, the blatantly unconstitutional conduct of Miles, Butler and Hendershott was open, obvious and repeated. Yet, no one from Oklahoma County/OCSO/OCCJA stepped in to take remedial action.   This exemplifies a systemic and deep-seated failure to train and supervise, with respect to the most basic aspects of correctional operations and constitutional conditions of confinement. As stated in the Probable Cause Affidavits:

> Upon interviewing DO Miles, he confirmed that he and Butler systematically worked together and used the benches, bars and attorney booth as a means to discipline inmates and teach them a lesson because they felt that disciplinary action within the Detention Center was not working in correcting the behavior of the inmates. Butler also confirmed that he used the booth as a means of punishment. Miles further stated that the inmates often "pissed off" Butler which evidence suggests led to those inmates being taken out of their cells/pods and mistreated. The secure point on the wall was measured as being 3ft from the floor up the wall. At this height and with no chair to sit on, it would have been nearly impossible for most inmates to sit or kneel thus forcing them to stand.

> Statements made by inmates and staff also indicated that in addition to the corporal punishment given by Miles and Butler, they additionally worked together and played children's music on a loop to play repetitively aloud while the inmates were housed in the attorney visitation booth thus putting undue emotional stress on the inmates who were most likely already suffering from physical stressors. The playing of the music was said to be a joke between Miles and Butler as confirmed by Miles.

Additional evidence showed that Detention Officers Miles and Butler worked under their direct supervisor, Lt. Hendershott, who **_failed to properly supervise and discipline_** them. Miles and Butler were the subject of numerous inmate complaints that detailed their **_history of mistreatment of inmates_** ranging from retaliation to mishandling of inmate mail. In addition, nearly **_20 hand written inmate complaints_** were received at one time regarding one or both Officers and directly forwarded to their supervisor, Lt. Hendershott. Evidence suggests that no investigation was conducted and subsequently no corrective action was taken by their direct supervisor, Lt. Hendershott. Evidence also showed that when Hendershott first learned of inmate mistreatment by Miles and Butler on 11-23-19, he took no immediate action to either aid the inmate victim or discipline the Officers. **_This appeared to have led to the Officers continuing to mistreat inmates where at least an additional six (6) inmates were physically victimized._**

70.     Oklahoma County/OCSO/OCCJA knew, must have known or should have known that, due to the obviously inadequate training and supervision, violations of detainees' constitutional rights was probable,  but failed to take reasonable measure to alleviate the risk of harm.

71.      Indeed, unabated unconstitutional conditions at the Jail long pre-date the misconduct of Miles, Butler and Hendershott.

72.      For instance, in 2008, the U.S. Department of Justice issued a report on unconstitutional conditions at the Jail. Federal inspectors found inadequate supervision and staffing, a lack of basic medical and mental health care, overcrowding and a high rate of assaults and deaths.

73.      Oklahoma County entered into a memorandum of understanding with the Department of Justice in 2009 that required the county to adequately fund and staff the jail by 2014, or face enforcement action from the federal government.

74.      The continually high rate of assaults, uses of violent force and deaths evince an utter failure to  abate the known unconstitutional conditions at the Jail.

## CAUSES OF ACTION

## EXCESSIVE USE OF FORCE
### (Fourteenth Amendment; 42 U.S.C. § 1983)

■ **Individual Liability and Underlying Violations**

75.     Paragraphs 1-74 are incorporated herein by reference.

76.     At the time of the complained of events, Plaintiffs, as pretrial detainees, had a clearly established constitutional right under the Fourteenth Amendment to be secure in their person and free from objectively unreasonable and excessive force.

77.      Any reasonable officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

78.     The force used by Officers Miles and Butler was excessive and not rationally related to any legitimate governmental or penological purpose.

79.     In the totality of the circumstances, at the time that the force as used by Officers Miles and , Plaintiffs were: 1) unarmed; 2) posing no security problem; 3) not actively resisting; and 4) posing no threat to anyone.

80.     As a direct proximate result of Officers Miles and Butler's unlawful conduct, Plaintiffs have experienced physical and emotional pain and suffering and other damages and losses as described herein entitling Plaintiffs to recover compensatory and special damages in amounts to be determined at trial.

■ **Official Capacity / Municipal Liability**

81.     Paragraphs 1-80 are incorporated herein by reference.

82.     The aforementioned acts of excessive force by Officers Miles and Butler are causally connected     with     customs,     practices,     and     policies     which     Oklahoma

County/OCSO/OCCJA/BOCC promulgated, created, implemented and/or possessed responsibility for.

83.     Those policies and customs are outlined in Paragraphs 56-74, *supra*.

84.     Oklahoma County/OCSO/OCCJA/BOCC knew, must have known or should have known that, due to the obviously inadequate training and supervision, that unconstitutional conduct by Oklahoma County/OCSO/OCCJA/BOCC personnel at the Jail , was probable,  but failed to take reasonable measure to alleviate the risk of harm.

85.     Oklahoma     County/OCSO/OCCJA/BOCC,     through     its     continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to citizens', including Plaintiffs', health and safety.

86.     As a direct and proximate result of the aforementioned customs, policies, and/or practices, Plaintiffs suffered injuries and damages as alleged herein.

### UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT / TORTURE
### (Fourteenth Eighth Amendment; 42 U.S.C. § 1983)

■ **Individual Liability and Underlying Violations**

87.     Paragraphs 1-86 are incorporated herein by reference.

88.     The tactics utilized by Officers Miles and Butler, including prolonged restraint without any legitimate purpose and known torture methods such as "standing stress position" restraint and the loud repeated music (here, "Baby Shark") constitutes arbitrary and capricious conduct which has no rational relationship to any legitimate governmental or penological purpose. The conduct of Officers Miles and Butler in this regard was also wanton, depraved and sadistic, and was intended to harm Plaintiffs.

89. Plaintiffs were subjected to unconstitutional conditions of confinement in violation of their Fourteenth Amendment rights.

90. As a direct proximate result of Officers Miles and Butler's unlawful conduct, Plaintiffs have experienced physical and emotional pain and suffering and other damages and losses as described herein entitling Plaintiffs to recover compensatory and special damages in amounts to be determined at trial.

■ **Official Capacity / Municipal Liability**

91. Paragraphs 1-90 are incorporated herein by reference.

92. The aforementioned unconstitutional acts of Officers Miles and Butler are causally connected with customs, practices, and policies which Oklahoma County/OCSO/OCCJA/BOCC promulgated, created, implemented and/or possessed responsibility for.

93. Those policies and customs are outlined in Paragraphs 56-74, *supra*.

94. Oklahoma County/OCSO/OCCJA/BOCC knew, must have known or should have known that, due to the obviously inadequate training and supervision, that unconstitutional conduct by Oklahoma County/OCSO/OCCJA/BOCC personnel at the Jail , was probable,  but failed to take reasonable measure to alleviate the risk of harm.

95. Oklahoma County/OCSO/OCCJA/BOCC, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to citizens', including Plaintiffs', health and safety.

96. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Plaintiffs suffered injuries and damages as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiffs pray this Court grant them the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit,  punitive damages for Defendants' reckless disregard of their federally protected rights, with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

-and-

CAMERON SPRADLING, OBA #8509
500 North Walker Avenue, Suite 140
Oklahoma City, OK 73102
Phone: (405) 605-0610
Fax: (405) 605-0615
Cameron@CameronSpradling.com

***Attorneys for Plaintiffs***